IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NINA JOYCE H., )
)
    Plaintiff, )
) No. 18 C 4913
v. )
) Magistrate Judge Gabriel A. Fuentes
ANDREW M. SAUL, Commissioner )
of Social Security,[1] )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Nina Joyce H.,[3] has moved to remand the Commissioner's decision denying her application for Disability Insurance Benefits ("DIB") (D.E. 15), and the Commissioner has moved to affirm. (D.E. 22.) The matter is now fully briefed. Because substantial evidence supports the ALJ's decision, the Court denies Plaintiff's motion and grants the Commissioner's motion.

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On October 1, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 9.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 21.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants are not anonymous litigants, in that their names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

I. **Procedural History**

Plaintiff initially filed for DIB on July 24, 2012, at age 42, alleging an onset date of disability of October 9, 2011, which was later amended to July 10, 2012. (R. 193, 730.) Plaintiff's date last insured ("DLI") was September 2016. (R. 708, 916, 924.) On December 23, 2014, the Administrative Law Judge ("ALJ") denied her application for benefits, and Plaintiff ultimately appealed to the U.S. District Court. On June 8, 2017, upon the parties' agreement, the District Court entered an order reversing the Commissioner's decision and remanding it for further administrative proceedings.[4] After remand, the ALJ held a second hearing and issued a second opinion denying Plaintiff's claim for benefits. The Appeals Council did not assume jurisdiction, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(a) ("when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand . . . unless the Appeals Council assumes jurisdiction of the case.")

II. **Administrative Record**

Plaintiff developed right arm and shoulder pain after she was a in a car accident in 2010. (R. 325-36.) In November 2011, March 2012 and July 2012, she received steroid injections for pain in her right shoulder (R. 323-24), and in August 2012, Plaintiff told her primary care physician, William Crevier, M.D., that she had no pain. (R. 321-22.) Plaintiff also took multiple medications for hypothyroidism (underactive thyroid) and asthma (chronic lung disease that inflames and narrows the airways). (R. 325-26.) On August 15, 2012, Plaintiff saw a mental health therapist, Latrice Richards, at the Sadie Waterford Assessment and Therapy Center. Plaintiff's mental status examination was normal except for some agitated motor activity. (R. 380.) She was

---

[4]On May 8, 2017, Plaintiff filed a second claim for DIB (R. 771), which the Appeals Council consolidated with Plaintiff's previous application. (R. 784.)

2

diagnosed with dysthymic (persistent depressive) disorder and assigned a Global Assessment of Functioning ("GAF") score of 51-60.[5] (R. 381.)

On August 20, 2012, Plaintiff filled out a function report for the Social Security Administration. She wrote that she was tired all the time and had chronic shoulder pain; she could wash dishes, clean the bathroom and prepare simple meals, but it took her a long time and she could only lift five pounds and walk two feet at a time. (R. 268-70, 273.) She babysat for her grandchild twice a week, cared for her dog and shopped for groceries with her son (R. 270-71). Plaintiff also reported that she got angry easily and had bad mood swings. (R. 273-74.) Her mother filled out a function report that was mostly consistent with Plaintiff's. (R. 243-50.)

On October 16, 2012, Michael Stone, Psy.D., examined Plaintiff for the Disability Determination Services ("DDS"). (R. 484.) Plaintiff was cooperative during her mental status examination, but her behavior was tense and irritable, her affect and mood appeared depressed, and although her thought process was logical and she had adequate judgment, she "exhibited problems maintaining a consistent level of attention and concentration throughout the evaluation." (R. 485, 487.) Dr. Stone assessed her with depression "secondary to medical problems." (R. 487.)

On October 17, 2012, a non-examining state agency consultant opined Plaintiff had mild restriction in her activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (R. 88.) Physically, another non-examining agency consultant opined that she could do light work and stand, walk or sit up to six hours in an eight-hour day, with limited overhead reaching. (R. 91-92.)

---

[5]The GAF scale is a measure of social functionality that is "no longer is widely used," but when Plaintiff applied for benefits, the Social Security Administration sometimes considered the scores. *Crump v. Saul*, 932 F.3d 567, 568 (7th Cir. 2019). A GAF range of 51 to 60 indicates "moderate" impairment of overall functioning. *Id.* (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994) ("DSM IV")).

On November 27, 2012, Plaintiff had a psychiatric evaluation at Sadie Waterford. (R. 489.) Her mood was listed as euthymic (normal, stable), but also depressed and angry, and her behavior was noted to be appropriate, but also hostile and defensive. (R. 493.) Plaintiff's diagnoses were listed as mild recurrent depression, generalized anxiety disorder and post-traumatic stress disorder ("PTSD") from past abuse. (R. 493, 495.) Her GAF was assessed at 45,[6] and her medications were listed as bupropion (an antidepressant) and clonazepam (a sedative used to treat anxiety). (R. 490.) On August 15, 2013, Ms. Richards found Plaintiff's presentation was normal, her mental functioning was intact and her GAF range was 51 to 60. (R. 640-41.) Her diagnosis was listed as dysthymic disorder, and she was still taking bupropion and clonazepam. (*Id.*)

Plaintiff also was treated at Chandra Diagnostic Cardiology for asthma and chronic obstructive pulmonary disease ("COPD");[7] she smoked every day and was frequently advised to quit. (*See, e.g.*, R. 559.) Between May and November 2013, Plaintiff often complained of shortness of breath upon exertion and some coughing and wheezing, which was worse when she was congested. (R. 570-72, 578-80, 585.) However, her lungs were clear without abnormality. (R. 567-69.) On November 26, 2013, Plaintiff had swelling, pain and cramping in her leg, which cardiology notes indicated could have been a sign of claudication (pain caused by too little blood flow). (R. 565-66.) Plaintiff also complained of daytime fatigue (*id.*), but at a February 2014 cardiology visit, she reported having less fatigue with nightly CPAP use (continuous positive airway pressure machine, used to treat sleep apnea). (R. 556.) She continued to have signs of claudication, usually after exertion, but cardiology notes indicated no further intervention was needed. (R. 553-55.)

---

[6] A GAF range of 41 to 50 signals a "serious" impairment. *Crump*, 932 F.3d at 568 (citing DSM IV at 34).

[7] COPD is a progressive disease that makes it hard to breathe and can cause coughing, wheezing, shortness of breath, chest tightness, and other symptoms. https://www.nhlbi.nih.gov/health-topics/copd. Cigarette smoking is the leading cause of COPD, and some people who have asthma can develop COPD. *Id.*

4

In February 2014, Plaintiff told Dr. Crevier that she had sharp pain and spasms in her neck (R. 550-51), and in May 2014, she complained of joint aches, back pain and breathing trouble. (R. 546-47.) In July 2014, Plaintiff reported that she did not have any pain. (R. 1013.) She continued taking multiple medications for asthma and hypothyroidism, as well as clonazepam and bupropion.

On July 23, 2014, at her first hearing before the ALJ, Plaintiff testified that she was often achy, irritable, angry or sad, she had trouble concentrating, and it was hard for her to get along with people. (R. 57.) In addition, because of her asthma and shortness of breath, it took her a long time to shower and dress herself, and she used her inhaler multiple times a day when she did household chores. (R. 60, 62, 70.) Plaintiff's husband did the laundry and grocery shopping because her shortness of breath made it too hard for her. (R. 70-71.)

In October 2014, Plaintiff complained to Dr. Crevier of shortness of breath upon exertion. Her medications remained the same except she was no longer taking bupropion. (R. 1017-18.) In December 2014, she reported pain in her thumbs, and Dr. Crevier added a prescription for Medrol, a steroid to treat inflammation. (R. 1024-26.) In January 2015, Plaintiff also complained of some chest pain and tremors in her right arm. (R. 1035-37.) In June 2015, she went to the emergency room with shortness of breath but was discharged two hours later after treatment. (R. 1112.)

On June 24, 2015, Plaintiff met with mental health therapist Deborah Bump and psychologist Nathanial Isaac, PsyD. Plaintiff told Ms. Bump that for the past week she had become angry and verbally aggressive at the slightest provocation. (R. 1090-91.) Her speech was slightly pressured, but she had normal rate of thoughts and intact judgment and insight. (*Id.*) In July 2015, Dr. Isaac assessed Plaintiff with a GAF of 50 and prescribed clonazepam, hydroxyzine for anxiety, and Lamictal (an anticonvulsant, also used to treat bipolar disorder). (R. 1092-96, 1101.)

Between June and October 2015, Plaintiff complained to her cardiologist and Dr. Crevier of tiredness, wheezing, chest pain and neck and shoulder pain. (R. 1086, 1590-92.) Testing showed no electrophysiological evidence of neuropathy or radiculopathy in her neck or shoulder. (R. 1255, 1259). In November 2015, Plaintiff went to physical therapy for right arm pain and numbness. (R. 1139, 1178-79.) By December 2015, she reported progress with physical therapy; she did not have neck pain, she had much less numbness in her right arm and hand, and she had better cervical range of motion and overall function. (R. 1182-83.) Plaintiff again complained of neck and right shoulder pain in June 2016 and March 2017. (R. 1353, 1355.)

On August 2, 2016, Plaintiff reported worsening shortness of breath (R. 1594), and on October 11, 2016, her new primary care physician, Jerome Buster, M.D., noted her asthma was very poorly controlled; she reported multiple nighttime and daytime asthma symptoms. (R. 1461.) On November 22, 2016, cardiology noted Plaintiff had continued shortness of breath and fatigue but indicated that her COPD was controlled. (R. 1596.)

On February 9, 2017, Plaintiff presented to licensed clinical professional counselor Beryl Armstrong with a depressed mood; she reported being angry all the time and feeling as if her family was falling apart. (R. 1439.) Her mental examination was otherwise normal. (R. 1440.) On February 21, 2017, Plaintiff told psychiatric nurse practitioner Yvette Johnson that she was depressed, anxious, and had trouble sleeping and eating. (R. 1433.) Her mental status examination was normal except for her depressed mood. (R. 1436-37.) In May 2017, Plaintiff presented to Ms. Armstrong with a melancholy mood; she complained of worsening depression and anxiety, which she attributed to intense pain in her right foot and marital problems. (R. 1475-76.)

## III. Evidentiary Hearing

On February 14, 2018, at her second hearing before the ALJ, Plaintiff testified that she could not raise her right hand because it hurt to hold her arm overhead or straight out. (R. 685.) She described having tremors and numbness in her right hand that made it difficult to hold a pen and dress herself; however, she could type on a computer and wash dishes for 10 to 30 minutes. (R. 685, 689-92.) Physical therapy alleviated her pain, but the pain returned when therapy ended. (R. 692.) Plaintiff testified she could stand for 15 minutes and walk for 10 minutes; she said she was prescribed a cane after a 2017 accident, but she did not bring it to the hearing. (R. 706-08.) Mentally, Plaintiff testified that she had angry, hours-long outbursts about twice a month when she felt overwhelmed and unable to handle things. (R. 697-702.)

The ALJ asked the vocational expert ("VE") to describe jobs available for a hypothetical individual limited to light work with the following additional limitations: no more than 10 pounds of pushing, pulling or lifting with the right arm; unlimited ability to sit, stand and walk with the option to sit for five minutes after 30 minutes of standing or walking; occasionally operate foot controls and climb ramps and stairs; frequently reach with the right arm up to 75 percent range of motion but never overhead; occasionally reach more than 75 percent bearing minimal weight; frequently perform fine and gross manipulation with the right hand, but no forceful grasping, torqueing, twisting or precise manipulation; no exposure to certain environmental or work hazards; simple, routine tasks requiring only simple judgment and decision-making with no multi-tasking; occasional and minor changes in the work setting; average production pace; no highly variable production pace; no work requiring self-direction or direct public service; brief and superficial interaction with public and co-workers incidental to primary job duties; and no crowded work environments or tandem work. (R. 713-18.) The VE testified that based on the Dictionary of

7

Occupational Titles ("DOT") and her 20 years of experience placing individuals in jobs, she knew of several jobs available in significant numbers for such a hypothetical individual, such as hand package inspector and marker, so long as they could perform frequent reaching and handling at a minimum range of 50 percent. (R. 718-20, 722.) Off-task behavior was acceptable up to 15 percent of the day, with only one absence per month. (R. 720.) The VE noted that the jobs she specified were not performed in isolation. (R. 723.)

## IV. ALJ's Decision

On March 23, 2018, the ALJ issued a written opinion finding that Plaintiff was not under a disability within the meaning of the Social Security Act from July 10, 2012, her alleged onset date, through her DLI, which the ALJ listed as June 30, 2015. (R. 649-50.) At Step One, the ALJ found she had not engaged in substantial gainful activity during this time period. (R. 650.) At Step Two, the ALJ found that through the DLI, Plaintiff had the following severe impairments: COPD, right shoulder osteoarthritis, affective disorder, cardiomyopathy and bunions. (R. 651.) At Step Three, the ALJ found Plaintiff impairments, alone or in combination, did not meet or medically equal the severity of a listed impairment. (*Id.*)

Regarding her mental impairments, the ALJ found Plaintiff had moderate limitation in understanding, remembering, or applying information and in concentrating, persisting or maintaining pace. (R. 652.) The ALJ pointed to medical records from 2015 and 2017 showing Plaintiff had normal thought process, attention and concentration and intact memory, insight and judgment. (*Id.*) In addition, the ALJ assessed Plaintiff with moderate limitation in interacting with others and adapting or managing oneself based primarily on her self-report in August 2012 stating that despite marital relationship issues, she lived with family, had no problems with self-care,

helped with household chores like cooking, cleaning, washing dishes and caring for the dog, shopped in stores with her son and sometimes took care of her grandchild. (R. 652-53.)

The ALJ assigned Plaintiff a residual functional capacity ("RFC") that essentially matched his hypothetical to the VE. (R. 653-54.) The ALJ reasoned that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible or consistent with the record evidence (R. 655), which showed "limited medical findings and no doctor support" for limitations exceeding the RFC. (R. 661.)

With regard to Plaintiff's COPD, cardiomyopathy and asthma, the ALJ recognized that Plaintiff periodically complained of coughing, wheezing and shortness of breath upon exertion. (R. 655, 657-58.) However, the ALJ found Plaintiff was "typically able to control her shortness of breath by using a variety of inhalers" -- which treatment the ALJ called "essentially routine and conservative" -- and "[i]n the majority of [her] regular doctor visits, her symptoms are benign," her lungs were clear, and she denied coughing, wheezing and shortness of breath. (R. 655, citing medical records from July through October 2012, June through September 2013, and January through February 2014.) Further, the ALJ found that objective testing -- including electrocardiograms, imaging and ultrasound testing -- were essentially normal. (R. 655, 657-58.) The ALJ acknowledged Plaintiff had sleep apnea and experienced fatigue but found that medical reports showed both improved with her use of a CPAP. (R. 656.) The ALJ also found Plaintiff's allegation of needing to rest after walking a couple of feet was excessive on its face and inconsistent with her own reports that she could wash dishes, clean the bathroom, care for the dog and cook simple meals. (R. 658.)

As for Plaintiff's right upper extremity and neck issues, the ALJ recognized her complaints of pain and a 2012 MRI confirming tendonitis in her right shoulder. (R. 655.) However, the ALJ

found that in 2011 and 2012, Plaintiff was able to control her pain with medication and periodic steroid injections. (*Id.*) In addition to pain, the ALJ acknowledged that Plaintiff occasionally complained of right upper extremity tremors in 2014, 2015 and 2016; however, the ALJ found testing showed no electrophysiological evidence of neuropathy or cervical radiculopathy in her right arm, x-rays showed only mild degenerative changes in her neck, and physical therapy in November and December 2015 alleviated her neck pain and improved her ability to drive and type. (R. 657-59.) Moreover, the ALJ noted that despite Plaintiff's claims of extreme right arm limitation, Plaintiff's attorney had confirmed that no doctor had noted reduced range of motion, sensory deficits or atrophy. (R. 661.) The ALJ stated that "[i]f the claimant's upper extremity were as limited as alleged, [he] would expect some more mention of decreased range of motion, atrophy, etc." (*Id.*) The ALJ "expressly reject[ed]" any range of motion limitations beyond 50 percent. (*Id.*)

The ALJ also addressed Plaintiff's complaints of intermittent right foot pain and bunions, which arose in 2016 and continued through 2017. (R. 657.) The ALJ noted that x-rays and electromyography of Plaintiff's right lower extremity were unremarkable, and a podiatrist treated her conservatively with shoe insoles. (R. 657, 659-60.)

Regarding mental health issues, the ALJ noted that in August 2012 and August 2013, Ms. Richards diagnosed Plaintiff with moderate symptoms of chronic depression, while in November 2012 and November 2013, a psychiatrist diagnosed Plaintiff with major depression, general anxiety disorder and PTSD, and assigned her a GAF score indicating serious depression. (R. 662.) The ALJ found that despite the inconsistencies, each evaluation found Plaintiff had normal and appropriate thought processes, mood, affect, and appearance. (*Id.*) Further, the ALJ noted that the psychiatric evaluations did not identify the examiner, did not fully explain the basis for the diagnoses, and gave "no indication regarding why the claimant's condition had supposedly

deteriorated." (*Id.*) The ALJ recognized that Dr. Isaac assessed Plaintiff with a GAF of 50 in 2015, but Plaintiff's mental status examination from that day was normal. (R. 658.) Likewise, the ALJ found that in 2017, although Plaintiff occasionally demonstrated a melancholy mood and reported depression, anxiety and mood swings, her mood improved with medication, and on examination she was alert and cooperative and had normal affect, attention, concentration and thought process. (R. 659, 661.) The ALJ explained: "That the claimant's emotional state improved with treatment is another of the many factors contributing to my assessment of the claimant's allegation and functional capacity." (R. 659.) The ALJ agreed with the October 2012 state agency mental RFC opinion except he gave moderate instead of mild limitations in social functioning due to Plaintiff's testimony about depression, mood swings, and trouble getting along with others. (R. 663.)

At Step Four, the ALJ found that Plaintiff was unable to perform her past work as a phlebotomist or cashier because those jobs require significant interaction with the public, which exceeded the RFC. (R. 663-64.) However, at Step Five, the ALJ concluded that based on the VE's testimony, Plaintiff could perform other work that existed in significant numbers in the national economy, and thus, Plaintiff was not disabled as defined in the Social Security Act "at any time from July 10, 2012, the alleged onset date, through June 30, 2015, the date last insured." (R. 665.)

V. **Analysis**

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal citations and quotations omitted). "An ALJ need not address every piece of evidence, but he must establish a logical connection between

the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

## A. Date Last Insured

To be eligible for DIB, Plaintiff must show she was disabled by her DLI. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). It is undisputed that the ALJ erred in stating that the DLI was June 30, 2015. The Commissioner admits Plaintiff's DLI was either July or September 2016 but argues that this error was harmless because the ALJ assessed all of the evidence of record, which extends through 2017. (D.E. 23: Gov. Mem. at 2, citing R. 774, 924.) By contrast, Plaintiff argues this error warrants remand because the ALJ "failed to adjudicate a period of over a year . . . during which she may have been entitled to benefits." (D.E. 16: Pl.'s Mem. at 7.)

An administrative error is harmless if the Court is "convinced that the ALJ would reach the same result on remand." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). Here, the Court agrees with the Commissioner that the ALJ would have reached the same result using a DLI of September 2016 because the ALJ considered the evidence through 2017 in reaching his decision finding Plaintiff was not disabled.[8] Plaintiff's contention that the ALJ did not "adjudicate" the period after June 30, 2015 is incorrect. (D.E. 24: Pl.'s Reply at 3.) The date error appears to have been an accidental misprint rather than a substantive calculation error. Thus, the Court finds that the error in the DLI was harmless.[9]

---

[8] Other courts have reached the same conclusion when faced with this issue. *See Ublish v. Astrue*, No. 11 C 4359, 2013 WL 80370, at *11 (N.D. Ill. Jan. 7, 2013) (holding that ALJ's error incorrectly identifying the DLI was harmless because "the ALJ accounted for the entire record up through the decision date and excluded no evidence on account of the erroneous DLI"); *see also Shooshtarian v. Colvin*, No. 13 C 1973 HRL, 2014 WL 4090581, at *2 (N.D. Cal. Aug. 19, 2014) (holding that error in DLI was harmless because it was "apparent from the written decision that the ALJ considered all the medical evidence, including records that postdate[d] the ALJ's misstated DLI.")

[9] That said, the Court cautions the Commissioner to avoid such careless errors in the future. The Appeals Council's order remanding the ALJ's first opinion in this case indicates that the primary reason for remand was the ALJ's inconsistent treatment of Plaintiff's upper extremity limitations: the ALJ had found she had a severe right shoulder impairment, but the ALJ imposed left instead of right arm limitations in the RFC. (R. 783.)

12

## B. Basis for the ALJ's RFC Determination

Plaintiff next argues that the ALJ did not build the requisite logical bridge between the "very specific range of light work" he assigned in the RFC and the evidence in the record because the ALJ did not adopt the state agency assessments and there was no other medical opinion in the record assigning Plaintiff an RFC. (Pl.'s Mem. at 7-8, 12-13.) Plaintiff contends that the ALJ was thus "faced with an evidentiary deficit," that he improperly filled with his own interpretation of the evidence. (*Id.* at 13.) The Court disagrees.

The ALJ must "cite[] to relevant evidence adequate to support [his] conclusion" as to the limitations in Plaintiff's RFC. *Schloesser v. Berryhill*, 870 F.3d 712, 720 (7th Cir. 2017). An ALJ's RFC assessment will not be overturned where "[t]he ALJ thoroughly discussed the medical and other evidence and carefully considered each of [Plaintiff's] impairments and related functional deficits" before assigning an RFC. *Summers*, 864 F.3d at 527.

In this case, contrary to Plaintiff's arguments, the ALJ adequately tied the limitations in the RFC to the evidence in the record, including: Plaintiff's attorney's confirmation at the hearing that no doctor recorded that she had reduced range of motion, sensory deficits or atrophy; the lack of electrophysiological evidence of neuropathy or cervical radiculopathy; x-rays showing only mild degenerative changes; and improvement of her pain with physical therapy and medication. (R. 661.) In addition, the ALJ considered Plaintiff's testimony, her August 2012 function report and her complaints of right upper extremity pain and tremor.

Plaintiff asserts that despite considering this evidence, the ALJ ignored the part of her August 2012 function report where she noted difficulty opening jars, dialing a phone, picking up coins, or using a pencil. (Pl.'s Mem. at 8.) However, the ALJ included limitations in the RFC to account for Plaintiff's difficulties with her right arm: to never reach overhead or apply forceful

grasping, torqueing or precision manipulation and to frequently but not constantly reach in other directions. The ALJ "used what he heard from [Plaintiff] to tailor an RFC that fit her limitations, though not necessarily the intensity to which she testified." *Green v. Saul*, 781 F. App'x 522, 528 (7th Cir. 2019). "The ALJ then assessed an RFC limiting [Plaintiff] to a significantly reduced range of light work." *Summers*, 864 F.3d at 527. "These limitations generously account for the functional limitations that could reasonably be expected to result from [her] medical impairments." *Id.*

Furthermore, to establish error in the RFC, it is Plaintiff's responsibility to show the record supports "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk*, 923 F.3d at 498. However, Plaintiff does not point to evidence that would support greater upper extremity limitations than those assessed by the ALJ, particularly any evidence that would undermine the ALJ's express rejection of limitations beyond 50 percent.[10] (R. 661.) Plaintiff's "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Summers*, 864 F.3d at 527. *See also Green*, 781 F. App'x at 527 (rejecting challenge to RFC where neither the claimant nor the record specified how sleep problems impaired her ability to work beyond what was included in the RFC). Therefore, the Court finds that the ALJ adequately supported the RFC with substantial evidence.

### C. Credibility of Plaintiff's Allegations

Plaintiff also contends that the ALJ failed to properly assess the credibility of her allegations. (Pl.'s Mem. at 14-15.) As Plaintiff points out, the ALJ initially used "meaningless boilerplate" to describe her allegations, finding that her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 14, citing R. 655.) However,

---

[10]In her brief, Plaintiff observes that the VE testified that a person limited to 25 percent range of motion and only occasional reaching (up to 1/3 of the day) would be unemployable. (Pl.'s Mem. at 9.) However, Plaintiff provided no evidence or even argument that she was so limited.

14

it is well-settled that "[t]he fact that the ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal citations and quotations omitted). Accordingly, contrary to Plaintiff's argument, courts in this district, including this one, have repeatedly rejected the argument that this boilerplate language changes the claimant's evidentiary burden. *See Aitmus R. v. Saul*, No. 18 C 5735, 2019 WL 4923208, at *7 n.13 (N.D. Ill. Oct. 4, 2019) (collecting cases).

Alternatively, Plaintiff contends that the ALJ did not adequately explain why he found her allegations inconsistent with the evidence. The Court "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester*, 920 F.3d at 510. Here, "the ALJ's credibility determination . . . was not patently wrong because the ALJ found [her] not fully credible for many specific reasons supported by the evidence." *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (internal citations and quotations omitted). These reasons include: diagnostic imaging, electrophysiological testing and ultrasounds documenting essentially normal or mild findings; Plaintiff's ability to control her symptoms with routine and conservative treatment such as medication, physical therapy, inhalers, CPAP and shoe insoles; regular doctor visits documenting only mild symptoms and no indication of reduced range of motion or sensory deficits; mental health evaluations finding Plaintiff had normal and appropriate thought processes, mood, affect, and appearance; and Plaintiff's ADLs, which included washing dishes, cleaning the bathroom, caring for a dog and cooking simple meals.[11]

---

[11]Contrary to Plaintiff's contention (Pl.'s Mem. at 14-15), in assessing a claimant's credibility, ALJs properly consider the effectiveness of treatment, *Green*, 781 F. App'x at 527, and whether a claimant's high level of daily functioning "suggest[s] she is not as limited as her allegations of disabling symptoms would indicate," so long as the ALJ does not equate the claimant's ability to perform certain ADLs with an ability to work full time. *Burmester*, 920 F.3d at 510-11 (upholding ALJ's credibility determination where his reasons included diagnostic imaging documenting only mild to moderate findings, normal findings of strength and range of motion, having intact memory and good communication skills, and ADLs suggesting the claimant was not as limited as she alleged).

Plaintiff argues that the ALJ erred by failing to credit her testimony that she had to frequently stop while walking. (Pl.'s Mem. at 14.) However, the ALJ found the evidence did not support Plaintiff's testimony, as the record showed Plaintiff's fatigue improved with CPAP use. (R. 653.) An ALJ may disregard a claimant's testimony where it conflicts with medical testing, contemporaneous reports made to physicians, and independent observations.[12] *See Burmester*, 920 F.3d at 510-11; *see also Schloesser*, 870 F.3d at 721-22. The ALJ included limitations in the RFC to address Plaintiff's fatigue to the extent they were supported in the record, such as the need to alternate position between sitting, standing, and walking up to five minutes every half hour. *See Green*, 781 F. App'x at 528-29 (rejecting argument that RFC did not adequately address claimant's fatigue where her need for a two-hour daily nap was not supported by evidence other than her testimony, which the ALJ did not credit). Because the ALJ's credibility decision "was tied to evidence in the record and was not patently wrong, [] we may not disturb it." *Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016).

### D. Limitations in Concentration, Persistence or Pace

Plaintiff also contends that the ALJ inadequately accounted for her moderate limitations in maintaining concentration, persistence or pace in the RFC. (Pl.'s Mem. at 9.) To account for Plaintiff's mental impairment, the ALJ included the following restrictions in the RFC:

> The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She ought not perform work which requires multitasking. She could perform work requiring an average production pace [] but is incapable of significantly above average or highly variable production pace work. She ought not perform work which requires significant self[-]direction. She is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief

---

[12]This case is thus distinguishable from *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017), which Plaintiff cites in support of her argument, because the ALJ in that case rejected a claimant's "unrebutted testimony" about his limitations, while in this case, the ALJ explained that Plaintiff's testimony was rebutted by the record evidence.

> and superficial interaction with the public which is incidental to her primary job
> duties. She is unable to work in crowded, hectic environments. The claimant can
> tolerate brief and superficial interaction with supervisors and co-workers, but is not
> to engage in tandem tasks.

(R. 653-54.) Specifically, Plaintiff argues that: (1) the ALJ failed to consider her moderate limitations together with her off-task time, which Plaintiff says could be more than 15 percent of the day due to her outbursts; (2) limiting her to average production pace "does not constitute a true restriction as it establishes only the general baseline; and (3) the ALJ failed to explain why she "would not have additional limitations in concentration, persistence or pace given her difficulties." (Pl.'s Mem. at 10-11.)

As Plaintiff points out, the Seventh Circuit has "rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence and pace." (Pl.'s Mem. at 10, quoting *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018).) "Merely limiting [a claimant] to simple, routine, and repetitive tasks with few workplace changes was not enough to address her limitations and ensure that she could maintain the concentration and effort necessary to function in a workplace and otherwise sustain employment." *Crump v. Saul*, 932 F.3d 567, 571 (7th Cir. 2019).

However, that is not what the ALJ did here. Instead, the mental RFC the ALJ assigned here is more analogous to the one the Seventh Circuit recently upheld as adequately accounting for moderate limitations in concentration, persistence, or pace in *Dudley v. Berryhill*, 773 F. App' x 838 (7th Cir. 2019). In *Dudley*, the ALJ limited the claimant to "simple, routine and repetitive tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment," "excluding work above an average pace, at a variable pace, or in crowded, hectic environments;" and "limiting

her interactions with the public, supervisors, and coworkers." *Id.* at 843. Unlike the RFC at issue in *Crump*, the RFC in *Dudley* limited the claimant to work at or below average pace and "work requiring the exercise of only simple judgment," which "specifically account[ed] for [the claimant's] concentration difficulties." *Id.* at 842. Plaintiff offers no support for her contention that the limitation to average production pace is not a true restriction. To the contrary, as in *Dudley*, such a restriction further accounts for difficulties in concentration.

In addition, the ALJ considered all limitations in concentration, persistence or pace that were supported by evidence in the record. Although Plaintiff appears to allege in her brief that her outbursts could take her off-task more than 15 percent of the day (Pl.'s Mem. at 11), this allegation is not confirmed anywhere in the record. *See Jozefyk*, 923 F.3d at 497 (holding that RFC adequately addressed moderate limitations in concentration, persistence or pace though it did not include the claimant's "self-reported symptoms that doctors, including his own treating physician, could not confirm.") Like in *Jozefyk*, Plaintiff claims she "suffers from psychological limitations while alone, [but] according to the medical evidence, [her] impairments surface only when [she] is with other people or in a crowd," and the ALJ adequately "tied the record evidence to the limitations included in the RFC finding, tailoring [Plaintiff's] workplace setting to accommodate" for her outbursts. *Id.* at 498. The Seventh Circuit has "upheld RFC determinations similar to the one here when they adequately account for the claimant's demonstrated psychological symptoms." *Id. See also Pytlewski v. Saul*, -- F. App'x --, 2019 WL 5884542, at *4 (7th Cir. Nov. 12, 2019) (holding that the ALJ adequately tied the RFC to the evidence in the record by "tailor[ing] [the claimant's] workplace setting to accommodate for [his] anxiety, depression, and anger issues by limiting his interaction with people and restricting him from making high-stakes decisions.")

18

Finally, even if there were any error in the RFC's limitations regarding Plaintiff's moderate limitations in concentration or pace, it would be harmless because "[i]t is unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace because [she] hypothesizes none" and "the medical record does not support any." *Jozefyk*, 923 F.3d at 498. As such, "there are no evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Id. See also Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (upholding RFC where the claimant did not "suggest a better way to capture the idea behind limitations in concentration, persistence, and pace and apply those problems to job requirements"); *Crump*, 932 F.3d at 571 (distinguishing *Jozefyk*, because in that case the claimant had not testified about restrictions related to concentration, persistence, or pace, and the medical evidence did not otherwise support any such limitations, while in *Crump*, the medical evidence "plainly show[ed]" that the claimant suffered from limitations in concentration, persistence or pace and the claimant "testified consistently" about her limitations.)

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to remand the Commissioner's decision denying her application for DIB (D.E. 15) and grants the Commissioner's motion to affirm. (D.E. 22.)

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: January 14, 2020**